UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

UNITED STATES OF AMERICA                    :
                                            :
    – against –                             :
                                            :
ROBERT EGAN and BERNARD McGARRY,            :
                                            :
                          *Defendants.* :
------------------------------------------------------------ X
INSERRA SUPERMARKETS, INC., LML             :
SUPERMARKETS, INC., SHOPRITE OF             :
GARNERVILLE, INC., CAPITAL ONE,             :
N.A., as assignee of United Check Cashing Corp., :
SULTANA DISTRIBUTION SERVICES, INC.,        :
SMITHFIELD ASSOCIATES LLC, WINDY            :
GATES, SOHO, INC., MAHOPAC NATIONAL         :
BANK, DOMINOS PIZZA, TONY MAESTRI,          :
DENBURG PIZZA, INC., and JAMES DENBURG,     :
                                            :
                  *Third-Party Petitioners.* :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:    08/28/2012

No. 10 Cr. 191 (JFK)

OPINION
AND ORDER

Appearances:

    For the United States of America:

        PREET BHARARA, UNITED STATES ATTORNEY FOR THE SOUTHERN
        DISTRICT OF NEW YORK
        One Saint Andrew's Plaza
        New York, NY 10007
        By:    Assistant United States Attorney David I. Miller

    For Third-Party Petitioners Inserra Supermarkets, Inc., LML Supermarkets,
    Inc., and Shoprite of Garnerville, Inc.:

        COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
        Court Plaza North
        25 Main Street
        Hackensack, NJ 07601
        By:    Michael S. Weinstein, Esq.

For Third-Party Petitioner Capital One, N.A.:

    HUNTON & WILLIAMS LLP
    200 Park Avenue, 52nd Floor
    New York, NY 10166
    By:    Ryan A. Becker, Esq.

For Third-Party Petitioner Sultana Distribution Services Inc.:

    KENT, BEATTY & GORDON, LLP
    425 Park Avenue, 31st Floor
    New York, NY 10022
    By:    Joshua B. Katz, Esq.

For Third-Party Petitioners Smithfield Associates LLC and Windy Gates
Soho, Inc.:

    ANTHONY MICHAELS, ESQ.
    325 Broadway, Suite 404
    New York, NY 10007

For Third-Party Petitioner Mahopac National Bank:

    DELBELLO DONNELLAN WEINGARTEN WISE & WEIDERKEHR, LLP
    One North Lexington Avenue
    White Plains, NY 10601
    By:    Frank J. Haupel, Esq.

For Third-Party Petitioners Dominos Pizza, Tony Maestri, Denburg Pizza, Inc.,
and James Denburg:

    ROBERT W. GEORGES, ESQ.
    299 Broadway, 17th Floor
    New York, NY 10007

JOHN F. KEENAN, UNITED STATES DISTRICT JUDGE

JOHN F. KEENAN, UNITED STATES DISTRICT JUDGE:

Thirty-eight third-party petitions have been filed in this ancillary criminal forfeiture proceeding. Each contains a demand for the return of some portion of $19,288,702.72 in United States currency seized from the vaults of the Mount Vernon Money Center (the "Seized Currency") in the course of the Government's investigation of defendants Robert Egan and Bernard McGarry. To date, the Government has settled thirty-one of these petitions. Those petitioners who have been unable to settle with the Government now move for summary judgment with respect to their claimed ownership interests in a total of $1,030,519.80 of the Seized Currency. For the reasons discussed below, the petitioners are entitled to recover the full amount claimed in their petitions, with the exception of Dominos Pizza and Tony Maestri. Dominos Pizza and Tony Maestri may recover only $30,264.00 of their joint petition for the return of $30,668.40. Subject to this limitation, the petitioners' motion for summary judgment is granted.

## I. BACKGROUND

The facts discussed below are taken from the Stipulation of Undisputed Facts ("Joint Stip."), the parties' Local Civil Rule 56.1 Statements, the declarations submitted in connection with the instant motion, and the exhibits attached thereto.

A.  MOUNT VERNON MONEY CENTER AND THE DEFENDANTS' SCHEME TO DEFRAUD THEIR CUSTOMERS

Prior to his arrest in connection with this case, Robert Egan ("Egan") owned and operated Mount Vernon Money Center ("MVMC"). (Joint Stip. ¶ 5.) Through its subsidiaries, MVMC operated four principal lines of business: (1) ATM

replenishment; (2) on-site employee check cashing; (3) in-store check cashing; and (4) armored transportation. (*Id.*) MVMC's armored transportation services were administered by American Money Services, LLC ("AMS"), which purchased American Armored Car, Ltd. in 2007 and became its successor in interest. (Joint Stip. ¶ 6.) AMS offered cash-processing and cash-counting services to some of its armored transportation customers, but for other armored transportation customers, AMS limited its services to collecting sealed bags or trays of currency and transporting these containers to third parties. (Pet'rs' L. R. 56.1 S. ¶¶ 7–10, Feb. 17, 2012, ECF No. 340) The Government admits that AMS personnel did not open the sealed bags of currency or in any way process the currency it was charged with transporting unless AMS personnel had "standing customer instructions" permitting them to do so. (Gov't L. R. 56.1 S. ¶ 13, Feb. 17, 2012, ECF No. 343.)

B.    MVMC'S RELATIONSHIP WITH NON-SETTLING PETITIONERS

Inserra Supermarkets, Inc., ("Inserra"), LML Supermarkets, Inc. ("LML Supermarkets"), Shoprite of Garnerville, Inc. ("Shoprite of Garnerville," and with Inserra and LML Supermarkets, the "Inserra Petitioners"), United Check Cashing Corporation, which later assigned its claims to Capital One, N.A. ("Capital One"), Sultana Distribution Services, Inc. ("Sultana"), Smithfield Associates LLC (doing business as "Pastis"), Windy Gates Soho, Inc. (doing business as "Balthazar"), Mahopac National Bank ("Mahopac"), Tony Maestri and Dominos Pizza (together, "Maestri's Dominos"), and James Denburg and Denburg Pizza, Inc. (together, "Denburg's Dominos") (collectively, "Non-Settling Petitioners"), were customers of AMS who claim to have contracted with AMS only for its currency transportation

services. According to the Non-Settling Petitioners, their money had always been delivered according to their contracts with AMS and they were at no point victims of Egan and McGarry's fraudulent scheme.

In support of these claims, the Non-Settling Petitioners rely on the statements of former AMS Vice President of Operations Steve Zabatino, as well as affidavits provided by employees and their contracts with AMS. (Pet'rs' L. R. 56.1 S. ¶¶ 19–20, 30, 57, 80, 91–92, 110–11, 122–23.) During an interview conducted by the Federal Bureau of Investigation ("FBI") on January 11, 2011, Zapatino stated that, for customers who had contracted only for currency transportation, AMS would pick up the currency in sealed bags and deliver the currency to the designated recipient on the same day or the following business day. (Weinstein Decl. Ex. A, Bates No. 000207, Feb. 17, 2012, ECF No. 329.) Zapatino clearly identified Maestri's Dominos, United Check Cashing, Mahopac, and Inserra as transportation-only customers, and was unsure about the relationships of Pastis, Balthazar, and Denburg's Dominos to AMS. (*Id.* at Bates Nos. 000207–12.) He also stated that "there were never any instances in which a customer's tamper-proof cash/currency bag had ever been intentionally opened by an AMS vault and/or armored transportation employee," unless the customer who owned the bag had contracted for processing and packaging services. (*Id.* at Bates No. 000213.) Despite Zapatino's uncertainty about AMS's relationship with Pastis, Balthazar, and Denburg's Dominos, the Government concedes that these three were also transportation-only customers of AMS. (Gov't L. R. 56.1 S. ¶¶ 80, 110–11.) In fact,

the Government has proffered no evidence to contradict the Non-Settling Petitioners' claims about the services AMS performed. (*See* Gov't L. R. 56.1 S. ¶¶ 19–20, 30, 57, 80, 91–92, 110–11, 122–23.)

The Non-Settling Petitioners became entangled in this proceeding in early February 2010, when AMS made a number of currency pick-ups from facilities owned by the Non-Settling Petitioners or third-parties. These pick-ups are described below, in Table One:

| Table One (AMS Pick-Ups from Non-Settling Petitioners in February 2010) | | | |
|---|---|---|---|
| *Petitioner* | *Pick-Up Date* | *Identifying Numbers* | *Amount* |
| Inserra Petitioners | 2/9/2010 | AH00694060 | $64,939.94 |
| Inserra Petitioners | 2/10/2010 | AH00692165 | $7,461.23 |
| Inserra Petitioners | 2/10/2010 | AH00694061 | $8,372.14 |
| Inserra Petitioners | 2/10/2010 | AH00688084 | $8,835.61 |
| Inserra Petitioners | 2/10/2010 | AH00696575 | $14,204.41 |
| Inserra Petitioners | 2/10/2010 | AH00691896 | $10,031.18 |
| Inserra Petitioners | 2/10/2010 | AH00684912 | $16,456.75 |
| Inserra Petitioners | 2/10/2010 | AH00692356 | $6,633.81 |
| Inserra Petitioners | 2/10/2010 | AH00692479 | $10,049.77 |
| Capital One | 2/11/2010 | F045716, E304793 | $364,400.00 |
| Sultana | 2/10/2010 | TT377141, TT377142 | $41,266.36 |
| Sultana | 2/11/2010 | TT377140 | $9,978.20 |
| Pastis | 2/11/2010 | H0926584 | $13,446.00 |
| Balthazar | 2/11/2010 | G546916 | $6,356.00 |
| Mahopac | 2/11/2010 | 99625662/KB10044801, 99625684/KB10003680, 9962518/KB10003680, 99625238/KB10020490, 99625214/KB10032352, 99625699/KB10056475, 99625697/KB10071508 | $404,000.00 |
| Denburg's Dominos | 2/11/2010 | G496741 | $13,420.00 |
| Maestri's Dominos | 2/2010 | X938328, X938329, X938330, X938331, X938332 | $9,616.40 |
| Maestri's Dominos | 2/11/2010 | F449017, F449021, F449022, F449023, F449025 | $13,572.00 |
| Maestri's Dominos | 2/11/2010 | F443045, F443046 | $7,277.00 |

(Pts.' L.R. 56.1 S. ¶¶ 21–29, 36–39, 63–66, 82, 97–102, 114–15, 126–27.)  Although the date is obscured on the receipt provided by Maestri's Dominos with respect to currency bags X938328, X938329, X938330, X938331, and X938332, the Government does not dispute Maestri's Dominos' assertion that these currency bags were picked up "in early February 2010." (*See* Gov't L. R. 56.1 S. ¶ 126.)  The currency bags picked up for delivery by AMS never reached their intended destinations.  After being held in MVMC vaults for temporary storage, the bags and trays listed above in Table One were seized at the direction of the Government.

C.    THE PROSECUTION OF EGAN AND McGARRY AND THE SEIZURE OF THE SEIZED CURRENCY

In early February 2010, the Government filed a criminal complaint charging Egan with conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349, and Egan was subsequently arrested.  Thereafter, the Court entered an order with Egan's consent that permitted the Government to seize all currency located in vaults operated by MVMC. (Consent Order, Feb. 23, 2010, ECF No. 8.)

Special Agent James Hilliard has submitted a declaration explaining the operation of the fraud with which Egan and McGarry were charged.  Hilliard attests that "the cash kept in the vaults for ATM customers was commingled." (Hillard Decl. ¶¶ 8(e)–(g), Oct. 18, 2010, ECF No. 72.)  AMS customers whose cash was counted and processed by AMS also had their money "commingled with other customers' cash in the vault." (*Id.* ¶ 8(h).)  Hilliard speculates that Egan and McGarry may have used ATM-replenishment customers' and certain of currency-transportation customers' money to finance MVMC's on-site payroll and in-store

check cashing operations, but Hilliard makes no clear factual assertion that Egan and McGarry actually misappropriated the money of currency transportation-only customers, which was typically held by MVMC entities overnight or for a similarly short duration. (*See id.* ¶¶ 8(i)–(k), 9.)

On February 11 and 12, 2010, the FBI seized "cash and other property," including the Seized Currency claimed by the Non-Settling Petitioners, from MVMC vaults. One of the vaults was located in Elmsford, New York, and two were located in Mount Vernon, New York. (Joint Stip. ¶ 2.) The Government has provided the Court with only a very rough account of how the Seized Currency was handled after it was seized from the MVMC vaults. What is clear from the Government's account is that the Seized Currency was transported to a Brinks facility in Brooklyn, New York, and then counted at that location. (Hilliard Decl. ¶ 9.) The Government claims that Brinks did not count the cash in each bag separately to confirm that each contained the amount of money indicated on the outside of each bag, and that it has been "unable to determine with certainty which of the bags collected were in fact [fraudulently] processed by MVMC." (*Id.* ¶ 10(b).) With respect to the trays of currency, the Government has asserted that they were "not segregated into separate customer bins," but makes no mention about whether individual currency trays were sealed when seized. (*Id.* ¶ 10(a).)

On March 10, 2010, Egan and McGarry were indicted on charges of bank fraud and conspiracy to commit bank fraud and wire fraud. Egan pleaded guilty in September 2010, and McGarry pleaded guilty in October 2010.

D.    PROCEDURAL HISTORY OF THIS ANCILLARY PROCEEDING

In connection with his guilty plea, Egan forfeited his interest in the Seized Currency on September 15, 2010. (Consent Order Forfeiture Spec. Prop. 2, Sept. 15, 2010, ECF No. 67.)  Between October 8 and December 31, 2010, eleven petitions were filed pursuant to 18 U.S.C. § 853(n)(2), each seeking the return of portions of the Seized Currency.

In March 2011, the Government agreed to settle three of these petitions (the "First Settled Petitions"), which had been filed by New York Community Financial, LLC, R.D.C. Payroll Services, Inc., B&H Check Cashing Services of Brooklyn, Inc., Mark Barberan, Granite Check Cashing Services, Inc., and James Lieto (the "First Settlement Petitioners") for a total settlement of $1,212,000.00—the full amount of the claims asserted. (*See* N.Y. Cmty. Fin. Stip. and Order 2–3, Mar. 7, 2011, ECF No. 119 (resolving claim for $340,000.00 filed by New York Community Financial, LLC and R.D.C. Payroll Services, Inc.); B&H Check Cashing Service of Brooklyn, Inc. Stip. and Order 2–3, Mar. 7, 2011, ECF No. 121 (resolving claim for $480,000.00 filed by B&H Checking Cashing Service of Brooklyn, Inc. and Mark Barberan); Granite Check Cashing Services, Inc. Stip. and Order 2–3, Mar. 7, 2011, ECF No. 122 (resolving claim for $392,000.00 filed by Granite Check Cashing Services, Inc. and James Lieto).)  After the resolution of the First Settled Petitions, $18,076,702.72 of the Seized Currency remained in the Government's possession.

On March 7, 2011, the Government filed a motion pursuant to Criminal Rule 32.2(c)(1)(A) to dismiss the eight petitions that it had not settled.  After the parties had commenced briefing the Government's motion, Mahopac and the Inserra

Petitioners requested leave to file petitions past the statutory deadline, arguing that the Government's published notice was not adequate with respect to their claims and that they lacked actual notice. The Court granted these requests to file late petitions, and based on the Government's argument that these new petitions were subject to the same legal defects as the other eight petitions, the Court considered these petitions in deciding the Government's motion to dismiss. *See United States v. Egan*, No. 10 Cr. 191, slip op. at 1 (S.D.N.Y. June 1, 2011); *United States v. Egan*, No. 10 Cr. 191 (JFK), 2011 WL 2022824, at *2 (S.D.N.Y. May 24, 2011). Therefore, ten petitions were pending when the Court considered the Government's motion to dismiss.

On August 2, 2011, the Government denied the Government's motion to dismiss. *See United States v. Egan*, 811 F. Supp. 2d 829, 839–40 (S.D.N.Y. 2011). At a conference held in late August 2011, the Court granted the Government's request to extend the time for additional claimants to file petitions for the return of portions of the Seized Currency until September 26, 2011. Subsequently, the Court permitted existing petitioners to amend and accepted twenty-five new petitions. Among these twenty-five were petitions filed on behalf of non-settling petitioners Capital One, Pastis, Balthazar, Sultana, Maestri's Dominos, and Denburg's Dominoes. (Capital One Am. Pet. in Response to Forfeiture Order ¶ 7, Sept. 23, 2011, ECF No. 222; Pastis and Balthazar First Pet. in Response to Forfeiture Order ¶ 1, Sept. 25, 2011, ECF No. 223; Sultana Third Party Pet. in Response to Forfeiture Order ¶¶ 22, 24, Sept. 26, 2011, ECF No. 224; Maestri's Dominos Pet. in

Response to Forfeiture Order ¶ 22, Sept. 26, 2011, ECF No. 233; Denburg's Dominos Pet. in Response to Forfeiture Order ¶ 22, Sept. 26, 2011, ECF No. 234.) The Court also denied as untimely three petitions: those filed on behalf of Money Cash ATM Corporation, Known Litigation Holdings LLC, and Carver Federal Savings Bank. *United States v. Egan*, No. 10 Cr. 191, slip op. at 1 (S.D.N.Y. Nov. 18, 2011); *United States v. Egan*, No. 10 Cr. 191, 2011 WL 4862925, at *2 (S.D.N.Y. Oct. 13, 2011). As of December 2011, thirty-five petitions were pending in this ancillary proceeding.

In January 2012, the Government entered into settlement agreements with third-party petitioners Trans Fast Remittance, LLC, Clothing Emporium, Inc., Money Spot, Inc., the Department of Veterans' Affairs Federal Credit Union, Cardtronics, Inc., XL Specialty Insurance Co., Starnet Insurance Co., MoneyGram International, Inc., CUMIS Insurance Society, Inc., C-Town Supermarket, Inc., ALPS Management, Inc., New York City Health and Hospitals Corporation, Actors Federal Credit Union, ADP Federal Credit Union, Bush Capital LLC, the Village of Elmsford, New York, Amalgamated Life Insurance Company, Four M Food Service of Atlantic Terminal LLC, Golden Krust Carribean Bakery & Grill, Metro-North Commuter Railroad Company, U.S. Courthouse SDNY Federal Credit Union, NorthEast Alliance Federal Credit Union, New York University, the Trustees of Columbia University in the City of New York, Greater Metro Federal Credit Union, New York Community Bank, National ATM Services, Inc., Town ATM Corp., MobileMoney, Inc., and Those Interested Underwriters Who Subscribed to the Policies/Certificates of Insurance Numbered B0702BB008120Y and

UM00018767SP09A (collectively, the "Second Settlement Petitioners"). The Government's settlements with the Second Settlement Petitioners resolved twenty-eight of the thirty-five petitions then remaining (the "Second Settled Petitions"). Unlike the settlement agreements entered into with respect to the First Settled Petitions, which provided for the return of fixed portions of the Seized Currency, the settlement agreements for the Second Settled Petitions provided Second Settlement Petitioners with only a *pro rata* recovery of that portion of the remaining Seized Currency remaining after the resolution of the Non-Settling Petitioners' claims and the appeals filed by Known Litigation Holdings LLC and Carver Federal Savings Bank. (*See, e.g.*, New York Univ. Stip. and Order ¶ 1–2, Jan. 18, 2012, ECF No. 286.)

On February 17, 2012, the Non-Settling Petitioners filed their joint motion for summary judgment and the Government filed its opposition.

## II. DISCUSSION

### A. LEGAL STANDARD FOR SUMMARY JUDGMENT

In an ancillary proceeding conducted pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, a party is permitted to move for summary judgment at the close of discovery under Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Crim. P. 32.2(c)(1)(B). Therefore, the Court determines the Non-Settling Petitioners' instant motion for summary judgment according to the standards normally applied to summary judgment motions in civil cases. *See id*. advisory committee's note ("[T]he Civil Rules may be followed [when] disposing of a claim on a motion for summary judgment.").

Under Civil Rule 56, a movant is entitled to summary judgment where the evidence, viewed in the light most favorable to the non-movant, shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Vacold LLC v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008) (citing *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). "[T]he substantive law of the action [determines] which facts are material," and "'[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Golden Pac. Bancorp. v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute regarding a material fact precludes the entry of summary judgment only where the dispute is genuine; there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Golden Pac.*, 375 F.3d at 200 (quoting *Anderson*, 477 U.S. at 249).

## B. LEGAL STANDARD FOR RECOVERY UNDER 21 U.S.C. § 853(n)

### 1. GOVERNING STANDARD IN THE SECOND CIRCUIT

District courts must order a defendant convicted of bank fraud to forfeit to the United States "any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result" of that defendant's bank fraud. 18 U.S.C. § 982(a)(2). When the Government seizes property under the federal criminal forfeiture statutes, a third party may claim a legal interest in the seized property only by petitioning the Court "for a hearing to adjudicate the validity of [its] alleged interest in the property." 21 U.S.C. § 853(k), (n)(2); *see also DSI Assocs. LLC v. United* States, 496 F.3d 175, 183 (2d Cir. 2007) ("It is well established that

third parties may not intervene during criminal forfeiture proceedings to assert their interests in the property being forfeited."). Whether a third party may recover claimed property through a properly initiated ancillary hearing turns on whether that party can establish that it has

> a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property[.]

21 U.S.C. § 853(n)(6)(A). In a criminal forfeiture proceeding, the Government stands in the shoes of the defendant, and a petitioner who establishes a legal interest in property superior to the defendant is entitled to recovery of that property. *United States v. Nektalov*, 440 F. Supp. 2d 287, 294–95 (S.D.N.Y. 2006), *aff'd E.J.D. Diamod Manu. v. United States*, 273 F. App'x 65 (2d Cir. 2008). As the United States Court of Appeals for the Second Circuit has stated unambiguously, "a defendant's consent to forfeit property does not expand the Court's power of that property, if the property is not the defendant's own." *United States v. Schwimmer*, 968 F.2d 1570, 1580–81 (2d Cir. 1992).

Where a district court determines that a third-party petitioner has established a sufficient interest in seized property by a preponderance of the evidence, the district court must "amend the order of forfeiture in accordance with its determination." 21 U.S.C. § 853(n)(6). After all third-party petitions have been resolved, the Government has discretion to use any seized property that remains to compensate victims. 21 U.S.C. § 853(i)(1). *See Willis Mgmt. (Vt.), Ltd. v. United*

*States*, 652 F.3d 236, 243 (2d Cir. 2011) (distinguishing those with traceable property interests in seized funds and general creditors of a criminal defendant, and holding that 21 U.S.C. § 853(i) provided an adequate legal remedy for general creditors of a criminal defendant).

The question of whether a particular claimant has a "legal interest" in property seized pursuant to the federal criminal forfeiture statutes is determined with reference to state property law. *Willis Mgmt.*, 652 F.3d at 245 (citing *Pacheo*, 393 F.3d at 353–56). However, as a matter of federal law, only one claiming an interest in the specific property—the *res*—that is the subject of a preliminary forfeiture order has standing to bring a claim. *DSI Assocs. LLC*, 496 F.3d at 184. The Second Circuit has interpreted this standing requirement broadly, and has recognized that under certain circumstances, a petitioner asserting an interest in property as the beneficiary of a constructive trust can have standing to bring an ancillary forfeiture proceeding. *See Willis Mgmt.*, 652 F.3d at 243, 246. However, the standing requirement prevents a defendant's general creditors from asserting a claim in ancillary criminal forfeiture proceedings. *See DSI Assocs. LLC*, 496 F.3d at 184–85.

Although an order of forfeiture is entered at the time of imposition of sentence, "[a]ll right, title, and interest [in property subject to forfeiture] vests in the United States upon the commission of the act giving rise to forfeiture." 18 U.S.C. § 982(b)(1); 21 U.S.C. § 853(c). In other words, federal law divests a victim of a fraudulent scheme of his or her interest "retroactively to the date of the original

criminal act." *United States v. Peterson*, 820 F. Supp. 2d 576, 584 (S.D.N.Y. 2011) (Chin, U.S.C.J.).

### 2. THE GOVERNMENT'S PROPOSED ALTERNATIVE STANDARD

The Government advances a standard for the resolution of the Non-Settling Petitioners' claims at odds with the Second Circuit precedent discussed above. The Government agrees that the Non-Settling Petitioners could establish their respective interests in portions of the Seized Currency by a preponderance of the evidence, and yet argues that the Court should permit the Non-Settling Petitioners to recover only a *pro rata* share of the remaining Seized Currency, on terms similar to those accepted by the Second Settlement Petitioners. As explained below, the Government's reasoning is unpersuasive.

The Government first stated its position that a *pro rata* distribution of the Seized Currency would be the only just resolution of the claims in this ancillary proceeding when it moved to dismiss all petitions other than the First Settled Petitions. In support of its Omnibus Motion to Dismiss, the Government argued that "all of the Petitioners are victims of the Defendants' fraud," and therefore none of the petitioners could establish a plausible ownership interest in any portion of the Seized Currency. (*See* Gov't Mem. Supp. Omnibus Mot. Dismiss 30, Mar. 8, 2011, ECF No. 125.) Despite the clear language of the criminal forfeiture statute and well-established Second Circuit precedent governing criminal forfeiture proceedings, the Government presented the alternative argument that even a petitioner who established ownership of particular property by a preponderance of the evidence would not be entitled to recovery of that property because Egan and

McGarry's fraud was analogous to a Ponzi scheme, and because the Government could show the petitioner had been a victim of Egan and McGarry's fraudulent scheme at some point in the past. (Gov't Mem. Supp. Omnibus Mot. Dismiss 33–34.)

When this Court denied the Government's motion to dismiss, it looked to the plain language of the applicable forfeiture statute and rejected the Government's proposed alternative standard. *United States v. Egan*, 811 F. Supp. 2d 829, 840 (S.D.N.Y. 2011). As described above, the Government subsequently entered into settlement agreements with the Second Settlement Petitioners.

The Non-Settling Petitioners have refused to settle their claims, and take the position that, at a hearing conducted pursuant to 21 U.S.C. § 853(n), they could establish two material facts by a preponderance of the evidence: (1) that they were the owners of identified bags and trays containing portions of the Seized Currency; and (2) that these bags were "confiscated directly from armored vehicles or while temporarily at the MVMC facility awaiting transfer from one armored vehicle to another for delivery to the intended destination." (Pet'rs' Mem. Supp. Mot. S. J. 5, Feb. 17, 2012, ECF No. 339.) They further argue that there is no genuine dispute about these factual issues. (*Id.*)

Rather than proffering evidence to contradict the evidence proffered by the Non-Settling Petitioners, the Government persists in its attempt to force the Non-Settling Petitioners to accept a *pro rata* distribution. However, the Government's proposed legal standard for the disposition of the instant motion is without merit in light of the facts of this case.

The Government cites *United States v. Ramunno* for the proposition that the victim of a Ponzi scheme could not recover a higher percentage of his money lost in the scheme merely because he was the last victim defrauded. 599 F.3d 1269, 1275 (11th Cir. 2010). Accepting the reasoning of the United States Court of Appeals for the Eleventh Circuit in *Ramunno* for the sake of argument, the case at bar is clearly distinguishable. As discussed below, Non-Settling Petitioners assert a legal (and not merely equitable) ownership interest in identified portions of the Seized Currency. The Government has failed even to suggest that any transportation-only customers, let alone the Non-Settling Petitioners, had their funds commingled with those of the ATM-replenishment customers or with customers whose transportation contracts included currency processing provisions.

Also distinguishable is *United States v. Durham*, 86 F.3d 70 (5th Cir. 1996). In *Durham*, the United States Court of Appeals for the Fifth Circuit affirmed the trial court's refusal to impose a constructive trust because it held that the trial court had not abused its equitable discretion. *Id.* at 73. *Durham* thus stands for the limited proposition that a district court may exercise its equitable discretion to prevent an inequitable result in an ancillary forfeiture proceeding where equity provides the only basis for a petitioner's claim. Leaving aside the issue of whether *Durham* is consistent with Second Circuit law, the Government's reliance on *Durham* is misplaced on two accounts, as *Durham* does not require this Court to exercise its equitable discretion in the manner urged by the Government and as Non-Settling Petitioners do not rely solely on equitable principles in pressing their

claims for recovery of their funds. Although they present credible arguments in favor of imposing a constructive trust, these are arguments in the alternative that the Court need not reach because Non-Settling Petitioners are entitled to recover under 21 U.S.C. § 853(n).

The factual linchpin of the Government's argument that a *pro rata* distribution is the only equitable result relies on its contention that the Second Settlement Petitioners would have all been able to establish an ownership interest superior to Egan's at the time of seizure. A careful review of the record in this case reveals that this assertion is unsupported by evidence. Inserra Petitioners, and only Inserra Petitioners, have asserted their claim for the money contained in the sealed bags with serial numbers AH00694060, AH00692165, AH00694061, AH00688084, AH00696575, AH00691896, AH00684912, AH00692356, and AH00692479. Similarly, only Capital One has claimed ownership of the funds contained in the bags with serial numbers F045716 and E304793. In taking this position, the Government fails to adduce specific evidence in support of the Second Settlement Petitioners' supposedly conflicting claims. Indeed, the Government has failed entirely to show that any of the bags or trays of currency listed in Table One have been claimed by more than one petitioner.

In advancing its proposed alternative standard, the Government ignores substantial differences in the claims asserted by certain parties in this litigation. A comparison between the petitions filed by Mahopac and Actors Federal Credit Union ("AFCU") is instructive of these differences. AFCU, a former ATM-

replenishment customer of MVMC, claims that it "sustained losses of monies from [MVMC] due to the criminal conduct of [Egan], and that MVMC violated the terms of an agreement between MVMC and AFCU by commingling or embezzling $3,984,840.00 owned by AFCU. (Actors Federal Credit Union V. Pet. ¶¶ 2, 10, 13–14.) Due to this $3,984,840.00 loss, AFCU claims it is "entitled to the return of [$3,984,840.00] from the funds seized by the FBI." (*Id.* ¶ 17.) AFCU claims an interest in currency that had been contained in certain ATM-refill packages and another sum of currency that was scheduled for delivery, but otherwise gives no identifying information about the condition its currency was in when seized by the Government in February 2010. (*See id.*) Mahopac, on the other hand, claims that it was not a victim of Egan and McGarry's fraud with respect to any claimed currency, and that it was the owner of nine specific currency trays, identifiable by tray numbers and serial numbers and which were awaiting delivery from the Federal Reserve Bank to Mahopac branches when the Government seized those trays in February 2010. (Mahopac Ltr. Pet. 4–5, May 27, 2011, ECF No. 161.) According to receipts offered by Mahopac, these trays contained a total of $404,000.00 when they left the Federal Reserve Bank, and according to both the terms of its agreement with AMS and AMS's normal practices, the trays would have been delivered the next business day, had the Government not seized them. (L'Heureux Decl. Ex. A, Contract Between American Armored Car, Ltd. and Mahopac Nat'l Bank Sch. A, Feb. 17, 2012, ECF No. 338.) The Government has adduced no evidence that any of the trays claimed by Mahopac were unsealed prior to their seizure by the

Government, and as explained below, Non-Settling Petitioners have adduced evidence from which one may conclude that the currency containers remained unopened and their seals intact.

The Court need not speculate about whether AFCU would have been able to identify specific portions of the Seized Currency at an ancillary hearing. That issue is moot in light of the Government's settlement with the Second Settlement Petitioners. However, the comparison between Mahopac's petition and AFCU's petition demonstrates that the Government's position that all of the petitioners other than the First Settlement Petitioners are similarly situated is inaccurate. While some of the Second Settlement Petitioners readily admit that they were victims of Egan and McGarry's fraudulent scheme, the Non-Settling Petitioners take the position that they were not implicated in Egan and McGarry's scheme to "play the float," because their cash was unavailable for Egan and McGarry's misuse for any material amount of time. Therefore, even if a proposed *pro rata* distribution might be appropriate under some circumstances, the Government's proposed alternative standard is inapplicable in this case.

## C. THE GOVERNMENT'S GENERAL OBJECTIONS TO NON-SETTLING PETITIONERS' LOCAL RULE 56.1 STATEMENT

In its Local Rule 56.1 Statement, the Government lists two general objections to the Non-Settling Petitioners' Local Rule 56.1 Statement.

First, the Government objects to the Non-Settling Petitioners' Local Rule 56.1 Statement on the grounds that "it contains improper legal conclusions and factual characterizations." (Gov't L. R. 56.1 S. 1, Feb. 17, 2012, ECF No. 343.) The

Government's objection on this ground is overruled, because it fails specifically to identify any objectionable legal conclusions contained in the Non-Settling Petitioners' Local Rule 56.1 Statement. The Court has considered the parties' Local Rule 56.1 statements only as recitations of the facts as to which each party believes there is no genuine material dispute. S.D.N.Y. & E.D.N.Y. L. Civ. R. 56.1(a) ("Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried.").

Second, the Government objects to the Non-Settling Petitioners' Local Rule 56.1 Statement on the grounds that "some or all of the Declarations submitted by the [Non-Settling Petitioners] . . . contain, in many instances, assertions that are not based on personal knowledge and are therefore inadmissible pursuant to Federal Rule of Evidence 602." (Gov't L. R. 56.1 S. 1.) The Government specifies five paragraphs of the Non-Settling Petitioners' Local Rule 56.1 Statement to which its second general objection applies: paragraphs 16, 17, 18, 72, and 85. In these portions of the Non-Settling Petitioners' Rule 56.1 Statement, Inserra Petitioners, Sultana, Pastis, and Balthazar assert—each using varying language—that the containers of their currency were "never opened, [and] the funds contained in the bag were never counted, or otherwise commingled with any other funds." (Pet'rs' L. R. 56.1 S. ¶ 85.) The Government contends that the proffered witnesses may not

testify about what was done with their employers' money when they were not physically present to observe the actions of Egan and McGarry's agents.

The Government's second general objection is without merit because it is well established that "[e]vidence of . . . an organization's routine practice may be admitted to prove that on a particular occasion the . . . organization acted in accordance with the habit or routine practice." Fed. R. Evid. 406.  To establish AMS's routine practice of properly handling their sealed currency containers, Non-Settling Petitioners submit the declarations of Inserra Petitioners, Sultana, Pastis, and Balthazar.  In these declarations, employees with personal knowledge of their employers' operating relationship with AMS attest that these petitioners were customers of AMS for a number of years, that these petitioners had contracted only for money transportation services, and that they never received any indication that AMS had tampered with their currency. (Inserra Decl. ¶¶3–4, Magnatta Decl. ¶¶ 4–7, 10–11; Zenteno Decl. ¶¶ 2–3.)  This proffered testimony satisfies the constraints of Rule of Evidence 602, and is admissible to establish that the Seized Currency remained in sealed containers when they were seized from the vaults of MVMC by agents of the Government in February 2010.[1]

D.    NON-SETTLING PETITIONERS' ENTITLEMENT TO RECOVER UNDER 21 U.S.C. § 853(n)

The determinative issue presented by the instant motion for summary judgment is whether there are any genuine, material factual disputes concerning

---

[1] The Court notes that the Government, though holding the Seized Currency in its custody at the time of its seizure, has adduced no evidence to contradict Non-Settling Petitioners' evidence concerning the routine practice of AMS.

Non-Settling Petitioners' ownership of the identified portions of the Seized Currency.

Non-Settling Petitioners claim ownership of these portions of the Seized Currency on the theory that Non-Settling Petitioners actually owned certain identified bags and trays of currency and the currency therein when they were seized by the Government. According to the Non-Settling Petitioners, the express contracts between the Non-Settling Petitioners and AMS established a bailment, thus granting AMS and its designees a possessory interest in the bags and trays of currency but no ownership interest and no ability to use the portions of the Seized Currency for any purpose other than short-term storage and transportation at the direction of the Non-Settling Petitioners. *See Herrington v. Verrilli*, 151 F. Supp. 2d 449, 457 (S.D.N.Y. 2001) (citing *Mays v. New York, N.H. & H.R. Co.*, 97 N.Y.S.2d 909, 911 (App. Term 1950)) (defining "bailment" under New York law).

As discussed above, Non-Settling Petitioners have proffered affidavits from their own employees, former employees of MVMC, and documentary evidence in support of their position that they retained actual ownership of any currency possessed by MVMC on their behalf. The Government does not dispute the Non-Settling Petitioners' characterization of their relationships with MVMC, and offers no evidence to contradict the Non-Settling Petitioners' claimed ownership of the funds. The Government even concedes that AMS opened tamper-proof containers for certain customers only when standing customer instructions permitted AMS do so and that "the [Non-Settling] Petitioners could prove by a preponderance of the

evidence at an ancillary hearing that they maintain superior right, title, and interest in a portion of the Seized Currency." (Gov't L. R. 56.1 S. ¶¶ 5, 13.)

The only factual disagreement between the parties concerns whether the actual bags and trays of currency remained sealed, and the currency therein remained un-commingled with other MVMC customer's funds, when they were seized by the Government in early February 2010. Non-Settling Petitioners contend that AMS had never before tampered with their sealed currency bags or trays, and that AMS handled the bags and trays seized by the Government according to the same standards employed on prior occasions. As discussed above, they have proffered evidence admissible to establish that AMS had a practice of keeping its transportation-only customers' sealed currency containers intact.

In response, the Government has put forth neither evidence nor even a plausible theory supporting its assertion that Egan and McGarry may have profited by commingling funds of armored car customers, which had only contracted for MVMC to possess their money for short periods of time. As described in the Government's Sentencing Memorandum, Egan was charged with soliciting:

> customer money on the false representations that he and his company would safeguard the funds entrusted to him and that he would not commingle or use those funds for purposes other than those specified in the various contractual relationships between MVMC and its customers. Instead, Egan and McGarry misappropriated customer money to cover . . . operating losses in MVMC's businesses, and to enrich themselves [at] their customers' expense.

(Gov't Sent. Mem. 1, May 1, 2011, ECF No. 150.) The Government's Sentencing Memorandum explains in detail how Egan and McGarry defrauded MVMC's ATM-replenishment customers and its armored-car transportation customers who had

contracted for MVMC to count and process cash and possess cash for multiple days by "playing the float." (*Id.* at 9–11.) However, no comparable explanation is given for how Egan and McGarry could have fraudulently profited by commingling money in their possession for less than twenty-four or forty-eight hours, as was the case for Non-Settling Petitioners. Because the Government has put forth no evidence to contradict the Non-Settling Petitioners' proffered evidence, any dispute about whether the bags or trays of currency were unsealed is not material or genuine.[2] *Rodriguez v. Schneider*, No. 95 Civ. 4083 (RPP), 1999 WL 459813, *1 n.3 (S.D.N.Y. June 29, 1999) ("If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention.").

---

[2] The Court notes that the Government's opposition to the Non-Settling Petitioners' motion for summary judgment is plainly inconsistent with the position it took when it settled the First Settled Petitions. In those settlements, the Government noted it lacked any evidence that Egan, McGarry, or anyone acting at their direction "ever commingled [the First Settled Petitioners'] funds with those of other customers of AMS or MVMC," and was aware of no evidence suggesting that AMS had violated the terms of its contracts with those petitioners. (N.Y. Cmty. Fin. Stip. and Order 2–3; B&H Check Cashing Service of Brooklyn, Inc. Stip. and Order 2–3; Granite Check Cashing Services, Inc. Stip. and Order 2–3.) The Government attempts to distinguish the Non-Settling Petitioners from the First Settled Petitioners by stating that it is "without sufficient evidence or information to determine for certain the Non-Settling Petitioners were *never* the victims of the fraud perpetrated by Robert Egan through AMS or MVMC." (Gov't Mem. Opp. Pet'rs' Mot. Summ J. 10 n.7.) The Government offers no explanation for this apparent shift in the burden of production and proof between the claims of the First Settled Petitioners and the Non-Settling Petitioners. The Government's reference to the "increased irregularities with delivery schedules for ATM customers," and the "common knowledge throughout the vault operations that MVMC personnel were directed to move cash from one customer's cash inventory reserve to another customer's cash inventory reserve," are respectively irrelevant and insufficient to establish a substantial evidentiary basis for treating these two sets of AMS customers. (*Id.*)

Looking to all available evidence and drawing all permissible inferences in favor of the Government, *Vacold LLC*, 545 F.3d at 121, the Court holds in favor of the Non-Settling Petitioners. With one exception, each of the Non-Settling Petitioners' total claims matches the sums of the specific currency picked up from MVMC in early February 2010. The amount of currency picked up from each of the Non-Settling Petitioners is set forth above, in Table One. As Table One shows, $146,984.84 was taken on behalf of Inserra Petitioners to the MVMC facility before being seized by the Government. This matches the $146,984.84 Inserra Petitioners now seek to recover. Capital One, Sultana, Pastis, Balthazar, Mahopac, and Denburg's Dominos have likewise substantiated their claims for $364,400.00, $51,244.56, $13,466.00, $6,356.00, $404,000.00, and $13,420.00, respectively.

Maestri's Dominos is the only one of the Non-Settling Petitioners who has failed to demonstrate entitlement to the full amount claimed. Maestri's Dominos seeks the return of $30,668.40, which it claims was contained in twelve bags seized by the Government from the vaults of MVMC. (Maestri's Dominos Pet. ¶¶ 26, 29–30, Sept. 26, 2011, ECF No. 233.) However, as shown in Table One, the twelve bags identified by Maestri's Dominos contained only $30,264.00 in currency when picked up by AMS and when later seized by the Government. Part of the discrepancy between the pick-up information and the amount claimed by Maestri's Dominos is attributable to the fact that the bag with serial number "X938330" contained $2,433.00 in cash and a check for $201.40. Maestri's Dominos has not shown that it sustained a loss resulting from the seizure of the check, because it has not

addressed whether the check was cashed by an unauthorized person or whether Maestri's Dominos attempted to have the seized check cancelled and reissued. Even if the Court counted the check as a recoverable portion of the Seized Currency, the amount contained in bags owned by Maestri's Dominos would only add up to $30,465.40—$203 short of the $30,668.40 claimed by Maestri's Dominos. The Court finds that Maestri's Dominos has made a showing of entitlement only to $30,264.00.

## III. CONCLUSION

For the reasons stated above, the Non-Settling Petitioners' motion for summary judgment [ECF No. 327] is GRANTED IN PART. The parties are directed to confer and produce a proposed order for the release of funds consistent with the Court's ruling within ten business days of the entry of this Opinion and Order. (*See, e.g.*, Pet'rs' Not. of Mot. for Summ. J. Ex. 1, Feb. 28, 2012, ECF No. 327.)

Mahopac is directed to submit a letter to the Court within seven days from the entry of this Opinion and Order regarding the status of its claim for $16,525.00 in coins seized from the MVMC vaults. (*See* Decl. of Carol L'Heureux 2 n.1, Feb. 17, 2012, ECF No. 338.)

SO ORDERED.

Dated:   New York, New York
         August 25, 2012

John F. Keenan
United States District Judge